UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| St. Paul Motorsports, Inc., <br> d/b/a St. Paul Harley-Davidson, | Civil No. 11-cv-03229 (PJS-TNL) |
| Plaintiff, <br> v. <br> Harley-Davidson Motor Company, Inc., <br> d/b/a Harley-Davidson Motor Company, <br> Defendant. | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiff St. Paul Motorsports, Inc., d/b/a St. Paul Harley-Davidson ("SPHD") moves this Court for the entry of a temporary restraining order and preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Immediate relief is needed to prevent Defendant Harley Davidson ("Harley") from unilaterally and materially modifying SPHD's right to sell Harley goods in violation of Minnesota statutes and from causing irreparable injury to SPHD with those unilateral modifications. In particular, Harley has issued new policies prohibiting SPHD from 1) selling any accessories and products to customers outside the United States; and 2) advertising or selling accessories and products on third-party websites, including major e-commerce traffic drivers like Amazon.com and Ebay.

Under well-settled federal and Minnesota law, a temporary restraining order and preliminary injunction is warranted given the statutory violation involved, the irreparable

harm that has been done and will continue from Harley's enforcement of its new policies, and the difficulties inherent in trying to quantify the injuries caused by Harley's actions.

## FACTUAL BACKGROUND

SPHD has been a Harley dealer since 1939. (Giannetti Aff. ¶ 3) (attached as Kramer Decl. Ex. C). SPHD holds a motor vehicle dealer license from the State of Minnesota. (*Id*. at ¶ 4.) Thomas L. Giannetti has owned and operated SPHD as the Dealer Operator since 1999. (*Id*. at ¶ 2.) SPHD is one of the most successful Harley dealerships in the nation: since 1999, it has earned Harley's highest annual recognition (the "Gold Bar & Shield") five times, the second highest recognition (the "Silver Bar & Shield") once, and the third highest recognition (the "Bronze Bar and Shield") four times. (*Id*. at ¶ 5.) In addition, SPHD was the "Region Retailer of the Year" from 2003 through 2007, and the "Motorclothes Sales Dealer of the Year" in its District in 2005, 2006, and 2007. (*Id.* at ¶ 6.)

### A. SPHD's E-Commerce Success

Harley refers to its parts, accessories, and motorclothes as "PAM" products. SPHD began selling PAM Products on-line in 2003. (*Id.* at ¶ 7.) SPHD saw the opportunity to grow its sales of PAM Products by reaching customers through the Internet and seized that opportunity. SPHD made significant investments in its business to support its Internet sales. These investments have included, among other things, purchasing a large inventory of PAM Products; remodeling and expanding facilities and systems for storage, processing, sales, and shipping of PAM Products; purchasing and maintaining computer hardware and software; hiring and training 17 employees to oversee and operate those

systems; investing in significant bandwidth for high speed internet; and otherwise building a large and sophisticated e-commerce business for the sale and shipment of PAM Products.  (*Id.* at ¶ 8.)

The net sales revenue from SPHD's on-line sales of PAM Products started small, but by 2005 it was over one million dollars, by 2007 it was over five million dollars, and in 2009 the sales were over ten million dollars and constituted about one-third of SPHD's total revenue.  (*Id.* at ¶ 9.) These sales were primarily accomplished through SPHD's own website (www.spharley.com) and three other websites: Ebay.com, Amazon.com, and ShopNBC. (Law Aff. at ¶ 3) (attached as Kramer Decl. Ex. D).  Since January of 2008, 87% of SPHD's e-commerce sales were completed using Ebay.com, Amazon.com and ShopNBC.  (*Id.*)

A significant proportion of those e-commerce sales go to foreign countries.  For example, of the $13,708,750 in motorclothes sales that SPHD made on eBay between 2005 and 2010, 45% were made to International customers. (*Id.* at ¶ 4.)  Comparable statistics of SPHD's international sales on Amazon are not available from Amazon, and SPHD does not keep electronic records that allow it to easily determine the proportion of its sales that go to international customers.  (*Id.*)  In addition, SPHD has customers from other countries who buy from SPHD over the telephone or via another, non-Internet, method, because of SPHD's excellent customer service.  (*Id.* at ¶ 5.)

The comments that SPHD has received from its U. S. and International e-commerce customers suggest that they come to SPHD because: SPHD has a large stock

of products, so that their order can be fulfilled and shipped quickly; SPHD provides superior customer service; and SPHD offers fair pricing. (*Id.* at ¶ 6.)

Sales of PAM Products have allowed SPHD to weather the economic downturn since 2008. (Giannetti Aff. ¶ 10.) Sales of motorcycles, with their higher price tags, decreased significantly in 2008 and thereafter. SPHD sold 1,031 motorcycles in 2007, 850 in 2008, 691 in 2009, and 538 in 2010. It anticipates selling around 540 motorcycles in 2011. (*Id.*) While SPHD's motorcycle sales are well below the levels of four years ago, the increase in e-commerce sales of PAM Products has allowed SPHD to continue making a profit as a business.

### B. Harley Aware of SPHD's E-Commerce Business

Harley knew about SPHD's on-line sales and encouraged them, as it brought additional revenue to both SPHD and Harley. Harley was aware of SPHD's on-line sales because the orders went through Harley's TALON computer network, which records and tracks all of SPHD's sales, and were clearly labeled as "Internet Sales" and "Amazon." (Giannetti Aff. ¶ 11.) Harley even counted on SPHD's continued high sales of PAM Products. Harley set SPHD's sales objectives for PAM Products at levels two and three times higher than any other dealer in the same district, which was achievable only through and because of e-commerce. (*Id.* at ¶ 12.)

Most critically, however, Harley was aware of SPHD's significant e-commerce operation because Harley representatives have seen it in action on multiple occasions and have discussed it with Mr. Giannetti. (Giannetti Aff. ¶¶ 10, 15-17.) Harley sends field representatives to visit its dealers, and those field representatives have personally visited

SPHD's facilities for storing and shipping the PAM products.  The e-commerce facilities would be impossible to miss in a visit to SPHD's dealership.  (*Id.* at ¶ 13.)  Photos show huge amounts of storage dedicated to the $1.6 million of PAM Product inventory kept by SPHD and to the 17 employees dedicated to SPHD's e-commerce business.  (Giannetti Ex. B.)  In fact, SPHD estimates that Harley made over a million dollars a year in profit off of SPHD's on-line and international sales of PAM products.  (Giannetti Aff. ¶ 14.)

In addition, Mr. Giannetti has discussed his e-commerce business at length with various Harley executives over the last few years.  At no point did any Harley executive or representative suggest that SPHD's actions were a breach of its Dealer Contract or otherwise anything but a boon to Harley and the brand.  (*Id.* at ¶ 15.)  After the significant economic downturn in 2008, Mr. Giannetti had made clear to Mike Kennedy, Harley's VP of North American Sales, and Greg Heichelbech, who was then in Harley's dealer development area, that SPHD's e-commerce business was keeping it afloat, and offsetting the reduction in motorcycle sales.  (*Id.* at ¶ 10.)  At an executive forum in 2008 or 2009, Mr. Giannetti spoke with Jim McCaslin, then Harley's President, about SPHD's e-commerce business and Mr. McCaslin indicated that Harley supported SPHD's e-commerce business.  (*Id.* at ¶ 16.)  At the annual dealer meeting in summer 2009, Mr. Giannetti spoke with Harley's new CEO, Keith Wandell, and Mike Kennedy about SPHD's e-commerce business and how SPHD had made it so successful.  (*Id.* at ¶ 17.)  Both Mr. Wandell and Mr. Kennedy reacted positively.  (*id.*)

### C.     The Dealer Contract

In September of 2009 when SPHD was selling $10 million dollars worth of PAM products a year, SPHD renewed its Harley-Davidson Motorcycle Dealer Contract (the "Dealer Contract") with Harley. (Giannetti Aff. Ex. A.) The term of the Dealer Contract runs from January 1, 2010 through December 31, 2014. (*Id.* at "2010 Addendum.")

The Dealer Contract grants to SPHD the right to "purchase and resell at retail. . . parts, accessories, clothing and other items  . . . . identified in the Products Addendum." (*Id*. at p. 1.) The Products Addendum in turn authorizes SPHD to sell "clothing, footwear, clothing accessories, rider accessories, personal items, household items, toys, collectibles, and miscellaneous novelty items" that Harley offers for sale to its dealers. (*Id*. at p. 6.) In fact, the Dealer Contract obligates SPHD to promote and sell "parts and accessories and motorclothes product sales" and meet reasonable quantity objectives Harley gives SPHD for those items. (*Id*. at General Conditions ¶¶ 3-4.)

The Dealer Contract places no restrictions on how SPHD may market or sell PAM products nor does it discuss internet sales of those items. (*See id.*) In contrast, the Dealer Contract expressly prohibits internet sales of motorcycles: "Dealer shall not sell new Harley-Davidson Motorcycles through any Internet web site or otherwise in e-commerce." (*Id*. at p. 2 ¶ 6.)

### D.     New Policies Announced February 2011

Early in 2011, Harley sent a memorandum to all its dealerships, announcing two new policies. (Giannetti Aff. ¶ 18, Ex. C.) The first, the "PAM Non-Retail Sales Policy," prohibits any sale of PAM products to customers outside the United States, and

took effect August 1, 2011. (*Id.*) The second, the "Third Party Internet Sales Policy," "prohibits the sale or offer to sell by a U.S. dealer of … PAM products on all third-party Internet websites" and is scheduled to take effect January 1, 2012 (together the "New Policies"). (*Id.*) Furthermore, "U.S. dealers may not place links to their website on any third-party Internet website for the purpose of offering to sell or completing a sales on-line of [Harley-Davidson] PAM products." (*Id.*) These policies would effectively cut off the great majority of SPHD's sales of PAM Products, by prohibiting international sales and cutting the legs out from SPHD's very successful e-commerce model. (Giannetti Aff. ¶ 19.)

Almost 90% of SPHD's internet sales are accomplished through third-party websites. (Law Aff. ¶ 3.) Almost half of SPHD's eBay sales are to international customers. (*Id.* at ¶ 4.) The successful e-commerce operation that SPHD has spent years developing will be decimated immediately if Harley enforces its New Policies. Ten million dollars of revenue will be reduced to two million (or less). (Giannetti Aff. ¶ 20.)

The impact is not solely a short-term monetary impact, however. The very viability of SPHD's dealership will be threatened if Harley enforces its New Policies. (*Id.* at ¶ 21.) The e-commerce sales have been essential in allowing SPHD to weather the economic downturn.

Furthermore, if the new policies are not enjoined and SPHD loses a large portion of its e-commerce revenue, SPHD may have to lay off some of the 17 employees it has dedicated to e-commerce. (Law Aff. ¶ 9.) Those employees have specialized skills. For example, they have developed particularized knowledge about either motorcycle parts or

the motorclothes that Harley offers and can answer detailed questions from customers about those products. (*Id.* at ¶ 7.) Those employees also have experience in how to list the items for sale on SPHD's websites and the third-party websites, and are trained to recognize internet fraud. (*Id.*) On average, SPHD's e-commerce sales associates have 2-3 years experience, and some have more than ten years experience. (*Id.*) It would be difficult to find equally knowledgeable and experienced people at a later date. (*Id.* at ¶ 9.)

In addition, SPHD has two employees who specialize in international shipping, and have expertise in the necessary declarations, customs rules, and applicable tariffs for shipping the e-commerce products overseas. Because of the significant amount of shipping SPHD does to foreign countries, and the complicated regulations that relate to those packages, these two employees are very valuable. (*Id.* at ¶ 8.) It would be difficult to find equally knowledgeable and experienced people at a later date. (*Id.* at ¶ 9.)

If Harley is not enjoined from enforcing the New Policies during this litigation,[1] and SPHD prevails, SPHD will not be able to immediately regain its internet business at the conclusion of the lawsuit. (*Id.* at ¶ 10.) One reason for this is the algorithms that web

---

[1] Although the ban on international sales was scheduled to be effective on August 1, 2011, the New Policies have not yet been enforced against Plaintiff. Plaintiff brought suit under a Wisconsin statute and a Wisconsin agency enjoined the New Policies during the short pendency of that litigation. Although Harley is based in Wisconsin, Harley moved to dismiss on jurisdictional grounds. On October 21, 2011, the Wisconsin administrative law judge issued a proposed decision to dismiss the suit based on his determination that the Wisconsin Division of Hearings and Appeals did not have jurisdiction to hear Plaintiff's claims. The New Policies' ban on international sales will go into effect when the proposed decision is adopted by the Administrator of the Division of Hearings and Appeals, which could occur as early as November 4, if this Court does not grant Plaintiff's motion. (*See* Kramer Decl. Ex. A.)

search sites like Google and Bing utilize. Those sites decide how highly to place a website among the search results based on a combination of factors, which include the number of strength of the third-party links. (*Id.* at ¶ 10.) If SPHD is prohibited from placing ads sending customers to its website, and from selling on Amazon and eBay, traffic to its websites will be down dramatically for months. (*Id.*) If and when SPHD were able to restart placing ads and selling on third-party sites, it would come up low among search results for Harley parts and clothes, based on its extended absence from e-commerce prominence. (*Id.*) SPHD predicts it would take 5-7 years to rebuild its current level of web traffic. (*Id.*)

In addition, some customers will become habituated to buying from another website during the time that SPHD is forced out of its e-commerce business. (*Id.* at ¶ 11.) It is likely that another seller or group of sellers initially will try to take advantage of SPHD's exit. (*Id.*) Once customers are used to buying from that new seller, it may be difficult to convince them to switch back to SPHD again in the future. (*Id.*)

Furthermore, it will take time to re-build SPHD's inventory of PAM Products. One of its advantages currently over other sellers is its large inventory of products. (*Id.* at ¶ 12.) Harley maintains a list of its 100 top-selling products, and SPHD carries 98-100 of them. (*Id.*) If Harley is allowed to implement its policies, however, and restrict much of SPHD's e-commerce activity, SPHD will not be able to maintain such a large inventory of PAM Products. (*Id.*) If SPHD is later able to re-start its current e-commerce activities, it would take a significant amount of time to re-build the type of inventory

SPHD needs to be competitive and provide excellent customer service in its internet sales. (*Id.*)

SPHD is simultaneously serving and filing its lawsuit against Harley in Ramsey County District Court and moving this Court for a temporary restraining order and temporary injunction that enjoins Harley from enforcing the New Policies against SPHD.

## ARGUMENT

I. **STANDARD FOR RELIEF**

Because SPHD alleges that Harley is violating the Motor Vehicle Sales and Dealership Act, and that Act explicitly authorizes injunctive relief, a preliminary injunction should be granted, regardless of irreparable harm, "if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." *United States v. White*, 769 F.2d 511, 515 (8th Cir.1985) ("When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose."); *see also O'Neal v. Moore*, Civ. No. 06-2336 ADM/JSM, 2007 WL 541695, at *20 (D. Minn. Feb. 16, 2007) ("[B]ecause an injunction is expressly authorized by the MGDPA, plaintiff does not need to prove irreparable injury.").

Even if a statutory violation were not involved, SPHD is entitled, under well-settled principles of federal law, to the issuance of a preliminary injunction in this matter. Fed. R. Civ. P. 65. The Court, in determining whether to grant a preliminary injunction, weighs the equities pursuant to the following four factors:

(1) the threat of irreparable harm to the movant in the absence of relief;

 (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

 (3) the movant's likelihood of success on the merits; and

 (4) the public interest.

*See Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Each of the above factors weigh in favor of granting preliminary injunctive relief.

## II. INJUNCTIVE RELIEF FULFILLS THE LEGISLATIVE PURPOSE OF THE MVSDA

SPHD is entitled to injunctive relief because Harley has violated Minnesota Statutes Section 80E.13(k), and an injunction would further the legislative purpose behind that statute.

### A. VIOLATION

Section 80E.13(k) makes it unlawful for Harley to do what it is doing to SPHD – namely, to threaten to unilaterally change the terms of the Dealer Contract to SPHD's detriment. The statute states:

> It is unlawful and an unfair practice for a manufacturer, distributor, or factory branch to engage in any of the following practices:
> * * *
> (k) threaten to modify or replace or modify or replace a franchise with a succeeding franchise that would adversely alter the rights or obligations of a new motor vehicle dealer under an existing franchise or that substantially impairs the sales or service obligations or investments of the motor vehicle dealer [.]

Minn. Stat. § 80E.13(k). The MVSDA protects SPHD because SPHD is a "new motor vehicle dealer" within the meaning of the Act: "a person who in the ordinary course of business is engaged in the business of selling new motor vehicles to

consumers or other end users and who holds a valid sales and service agreement, franchise, or contract, granted by a manufacturer, distributor, or wholesaler for the sale of its motor vehicles." Minn. Stat. § 80E.03, subd. 3. Similarly, Harley is a "manufacturer" or "distributor" within the meaning of the Act. *Id.* at subds. 4, 5. In addition, the Act protects all "dealers of motor vehicles doing business in this state" and SPHD is a licensed Minnesota dealer. Minn. Stat. § 80E.01.

Harley has "threaten[ed] to modify or replace" SPHD's franchise with a succeeding franchise, within the meaning of the statute by issuing the New Policies in February of 2011. The Act defines a franchise as "the written agreement or contract between any new motor vehicle manufacturer and any new motor vehicle dealer which grants to the dealer the right to market motor vehicles and which purports to fix the legal rights and liabilities of the parties to the agreement or contract." Minn. Stat. § 80E.03, subd. 8. In this case, Harley has modified SPHD's Dealer Contract by issuing the New Policies. The modification is especially egregious since Harley had recently executed a new four-year agreement with SPHD, which contained no changes in the previous Internet Sales Policy or Non-Retail Sales Policy.

Furthermore, the New Policies both "adversely alter" SPHD's rights under its Dealer Contract and "substantially impair" SPHD's investments in its dealership, so that the modification is unlawful. SPHD had a contractual right to sell PAM products, through whatever methods it chose, including the Internet, and to any customers it chose, including those abroad. The New Policies take those two

contractual rights away.  Furthermore, SPHD has made a significant investment in its e-commerce business, including expanding and renovating its physical facilities to make room for the necessary inventory and shipping operations, hiring and training 17 employees, purchasing many extra computers, and investing in significant internet bandwidth, among other items.  That investment, which has proved to be a smart business decision, will be substantially impaired by Harley's enforcement of the New Policies.

Because Harley's New Policies modify SPHD's Dealer Contract in a way that adversely alters SPHD's rights under that agreement and substantially impair SPHD's investment in its e-commerce business, Harley's action is unlawful under Section 80E.13(k).

### B.     LEGISLATIVE PURPOSE

SPHD's requested temporary restraining order is appropriate because Harley has violated Section 80E.13(k), the statute authorizes injunctive relief, and injunctive relief would further the legislative purpose behind the Motor Vehicle Sale and Distribution Act.  *See O'Neal v. Moore*, 2007 WL 541695, at *20.

The Minnesota Legislature explicitly authorized injunctive relief for a violation of Section 80E.13:

> Any person whose business or property is injured by a violation of sections 80E.01 to 80E.17, or any person injured because of the refusal to accede to a proposal for an arrangement which, if consummated, would be in violation of sections 80E.01 to 80E.17, may bring a civil action to enjoin further violations.

Minn. Stat. § 80E.17.  Furthermore, immediate injunctive relief in this case is entirely consistent with the legislative purpose behind the statute.  The Minnesota Legislature passed the Motor Vehicle Sale and Distribution Act, in part, "to protect and preserve the investments and properties of the citizens of this state."  Minn. Stat. § 80E.01.  The Minnesota Supreme Court has recognized that a sister statute to the MVSDA was enacted "to protect the dealer, who is often in a weaker bargaining position than the grantor who inherently has superior economic power in the negotiation of dealerships"  *Astleford Equipment Co. v. Navistar Int'l Transp. Corp.,* 632 N.W.2d 182, 191 (Minn. 2001).  Because Harley unilaterally imposed the New Policies on SPHD, and SPHD is in a weaker bargaining position, and because the New Policies will substantially impair SPHD's investments in its e-commerce business, SPHD's requested injunction fulfills the legislative purpose behind the Act.

### III.   ALTERNATIVELY, SPHD MEETS THE *DATAPHASE* FACTORS

Even if this Court were not to apply the special test for injunctive relief based on a statutory claim, SPHD would meet the *Dataphase* test, which analyzes the following four factors in determining whether to order injunctive relief:

(1)   the threat of irreparable harm to the movant in the absence of relief;

(2)   the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

(3)   the movant's likelihood of success on the merits; and

(4)   the public interest.

*See Dataphase Systems,* 640 F.2d at 114.

With respect to the first factor, in the absence of injunctive relief, SPHD will suffer the type of serious and irreparable injury that warrants immediately injunctive relief. The declarations of Chris Law and Thomas Giannetti establish at least three types of harm that SPHD will suffer if Harley is allowed to enforce the New Policies during this litigation, all of which courts have found sufficient to support an injunction.

First and most importantly, the New Policies will threaten the viability of the St. Paul Harley Davidson dealership. (Giannetti Aff. ¶ 21.) E-commerce has provided one third of SPHD's revenue for the past few years and has kept SPHD profitable for the past three years; losing that revenue would be devastating. (*Id.* at ¶ 10, 21.) The possible destruction of a business is a type of great and irreparable injury that warrants injunctive relief. *See, e.g., B.P.G. Autoland Jeep-Eagle v. Chrysler Credit Corp.*, 785 F. Supp. 222, 229 (D. Mass. 1991) (granting preliminary injunction after finding "failure to reinstate B.P.G.'s line of credit will almost surely result in its failure to function as a franchise"); *Automotive Elec. Serv. Corp. v. Assoc. of Automotive Aftermarket Distribs.*, 747 F. Supp. 1483, 1513-14 (E.D.N.Y. 1990) (granting temporary and then permanent injunction where loss of one-third gross sales that would result from termination threatened existence of business, creating irreparable harm). As the Second Circuit observed in another motor vehicle dealer case: "[Plaintiff] want[s] to sell automobiles, not to live on the income from a damages award." *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970).

Furthermore, if the New Policies are implemented during this litigation, SPHD will lose significant goodwill in its business that it may not be able to recover, or may

only be able to recover years after the litigation. SPHD will customers, due to the nature of consumer loyalty, and will have to spend significant time re-building its current level of Internet and international sales, even if and when this Court permanently enjoins Harley from enforcing the New Policies. *See, e.g., Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.,* 336 F.3d 801, 805 (8th Cir. 2003) (loss of intangible assets such as reputationn and goodwill constitutes an irreparable injury); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (finding that a potential loss in consumer goodwill qualifies as irreparable harm); *American Standard, Inc. v. Meehan*, 517 F. Supp. 2d 976, 988-89 (N.D. Ohio 2007) (finding the loss of customer goodwill and employees' jobs sufficient to establish irreparable harm);*Cherne Indus., Inc. v. Grounds & Assocs., Inc.,* 278 N.W.2d 81, 92 (Minn. 1979) (injunction justified "to prevent further injury to plaintiff's competitive position"); *North Star v. Navistar*, No. A10-864, 2011 WL9173, at *8-9 (Minn. Ct. App. Jan. 4, 2011) (evidence that plaintiffs "would likely suffer significant and irreparable loss of customers, employees and business opportunities" sufficient to demonstrate irreparable harm) (unpublished) (attached as Kramer Decl. Ex. B).

Additionally, SPHD will likely have to let go some or all of its e-commerce employees, who have specialized skills. (Law Aff. ¶ 9.) Courts have found that the loss of skilled employees constitutes the type of harm that justifies injunctive relief. *E.g., NACCO Materials Handling Group, Inc. v. Toyota Materials Handling USA, Inc*., 366 F. Supp. 2d 597, 609-10 (W.D. Tenn. 2004) (granting preliminary injunction based in part on plaintiff's testimony that it would lose trained technicians); *see generally* 3 Franchise Distribution Law & Practice § 17.40 (2011) ("Franchisees may show irreparable injury

from the loss of their businesses, the difficulty of computing damages, the loss of customers, goodwill, or a distinctive product line or employees.").

Moreover, "[i]rreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate." *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1092 (D. Minn. 1981), *quoting Danielson v. Local 275, Laborers Int'l Union of N. Am.*, 479 F.2d 1033, 1037 (2d Cir. 1973), *aff'd* 684 F.2d 565 (8th Cir. 1982). In this case, it would be very difficult to estimate how many of SPHD's e-commerce current sales are to International customers (*see* Law Aff. ¶ 4), and therefore it would be difficult, if not impossible, to estimate the damages suffered as a result of those lost sales. Similarly, it is difficult to estimate how many Internet and international customers SPHD will be able to regain at the conclusion of litigation, and how long it may take to regain those customers, or regain SPHD's current level of sales. For those reasons, injunctive relief is appropriate.

With respect to the second factor, in contrast to the irreparable harm facing SPHD, Harley would suffer no harm by virtue of the injunction, and in fact would continue to earn profits off of SPHD's e-commerce business. Accordingly, the relative hardships strongly favors an injunction.

With respect to the third *Dataphase* factor, relating to likelihood of success, a movant need not prove the merits but must bring forth only "serious questions of law and fact" which deserve to be investigated, if the balance of the hardship tips in favor of the movant. *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984); *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003) (movant "is not required to

prove a mathematical (greater than fifty percent) probability of success on the merits," question is whether movant has a "fair chance of prevailing" after discovery and a full trial). Here, SPHD more than satisfies this minimal test. For all the reasons set forth above, there is a very high likelihood that SPHD will prevail on its claim that Harley's New Policies violated Section 80E.13(k).[2]

The fourth *Dataphase* factor considers public policy. In adopting the MVSDA, the Minnesota legislature recognized the imbalance of power present in the relationship between manufacturers and dealers and sought to prevent abuses and preserve investments. *See* Minn. Stat. § 80E.01. Minnesota courts recognize if statutes protecting franchisees or dealers apply, then public policy favors a temporary injunction. *See Pacific Equip. & Irrigation, Inc. v. The Toro Co.*, 519 N.W.2d 911, 917 (Minn. Ct. App.

---

[2] SPHD is also likely to succeed on its breach of contract claims. Under either Minnesota or Wisconsin law, the duty of good faith and fair dealing is implied in the parties' Dealer Contract. *See, e.g Metropolitan Ventures, LLC v. GEA Assocs.,* 717 N.W.2d 58, 69 (Wis. 2006) (under Wisconsin law, a "duty of good faith is implied in every contract, and is a guarantee by each party that he or she 'will not intentionally and purposely do anything to prevent the other party from carrying out his or her part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'"); *Hennepin Cnty. 1986 Recycling Bond Litig.*, 504 N.W.2d 494, 502 (Minn. 1995) (Minnesota law). By threatening to unilaterally change the terms of SPHD's Dealer Contract, knowing that it would destroy a large revenue stream for SPHD, Harley has breached its obligation of good faith and fair dealing in the performance of SPHD's Dealer Contract. Harley's threat to severely restrict SPHD's sale of PAM Products has also breached Harley's express grant to SPHD to purchase PAM Products for resale. In addition, SPHD is likely to succeed on its tortious interference claim. By seeking to implement the New Policies, SPHD has intentionally and maliciously pursued a course of conduct for the purpose and with the effect of inducing SPHD's customers to discontinue their business with SPHD and preventing SPHD from being in the position to maintain or acquire business of customers. *See, e.g., Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 796 (Wis. 2006); *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 632-633 (Minn. 1982) (citing Restatement (Second) of Torts § 766B (1979)).

1994) ("If the franchise act applies, the consideration of public policy would favor [plaintiff], since [plaintiff] would be entitled to special protection under the law as a franchisee."). Because it is clear that the MVSDA applies to SPHD and was intended to protect dealers like SPHD, the public policy behind the statutes clearly favors injunctive relief.

## CONCLUSION

For all the reasons above, SPHD requests that this Court immediately enjoin Harley from enforcing the New Policies during this litigation.

Dated: November 2, 2011        /s/ Douglas R. Boettge
                               Douglas R. Boettge (MN #0237292)
                               Liz Kramer (MN #0325089)
                               Lawrence J. Field (MN #0125775)
                               LEONARD, STREET AND DEINARD
                                Professional Association
                               150 South Fifth Street, Suite 2300
                               Minneapolis, MN  55402
                               Telephone:  612-335-1500
                               Facsimile:  612-335-1657
                               *Attorneys for Plaintiff*
                               *St. Paul Motorsports, Inc.,*
                               *d/b/a St. Paul Harley-Davidson*